# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

RICHARD JOHNSTON,

    Plaintiff

v.

KAREN GEDNEY,

    Defendants

Case No.: 3:16-cv-00754-MMD-WGC

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF Nos. 50, 61

This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is Defendants' Motion for Summary Judgment. (ECF Nos. 50, 52, 52-1 to 52-4.) Plaintiff filed a response (ECF No. 60), and Counter-Motion for Summary Judgment (ECF No. 61).[1] Defendants filed a reply in support of their motion (ECF No. 67), and response to Plaintiff's motion (ECF No. 68). Plaintiff filed a reply in support of his motion. (ECF No. 72.) Plaintiff was granted leave to file a sur-reply in response to Defendants' reply. (ECF No. 74.) The sur-reply is filed at ECF No. 81.

After a thorough review, it is recommended that Defendants' motion be granted, and Plaintiff's motion be denied.

## I. BACKGROUND

Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (Compl., ECF No. 4.) The

---

[1] These two documents are identical, but were docketed separately by the Clerk's Office.

1  events giving rise to this action took place while Plaintiff was housed at Northern Nevada

2  Correctional Center (NNCC). (*Id.*) Defendants are Dr. Karen Gedney and Dr. Romeo Aranas.

3  (Screening Order, ECF No. 3.)

4      On screening, Plaintiff was allowed to proceed with an Eighth Amendment claim of

5  deliberate indifference to his serious medical needs based on allegations that Defendants failed to

6  adequately treat his back issues. (ECF No. 3.)

7      Specifically, Plaintiff alleges that he suffered severe work-related back and head injuries

8  prior to his incarceration that have progressively worsened during incarceration. In March of

9  2014, Plaintiff was sent to NNCC to be evaluated by NDOC's orthopedic specialist and NNCC

10 physicians after seeking treatment for his back pain. Dr. Marsha Johns (who is not a defendant in

11 this action)[2] referred him to Dr. Richard Long (also not a defendant), the orthopedic specialist,

12 who ordered an MRI of his lower back. Plaintiff explained his prior treatment with his pain

13 specialist, pain medications and epidural injections to Dr. Long. Plaintiff claims Dr. Long

14 refused to acknowledge that the epidural injections he received prior to incarceration were

15 effective, despite his medical records indicating they were. In June of 2014, Plaintiff received an

16 MRI, but he alleges NNCC physicians refused to provide him with the results, despite numerous

17 requests. Further, Plaintiff alleges no treatment was provided.

18      Plaintiff submitted medical kites to Dr. Gedney and Dr. Johns for the results of the

19

20

21 _____

22 [2] Plaintiff belatedly moved to amend to name Dr. Johns and Dr. Martin Naughton as defendants;
   however, the court denied that motion on July 30, 2019, finding that Plaintiff sought leave to
   amend outside the scheduling order deadlines and did not demonstrate good cause for allowing
23 the belated amendment as he knew of the alleged involvement of Dr. Johns and Dr. Naughton
   long before the deadline expired. (ECF No. 66.) Therefore, the action is proceeding only against
   Drs. Gedney and Aranas.

June 2014 MRI. On February 11, 2016, Dr. Gedney called Plaintiff to the NNCC clinic to read him the results. Plaintiff alleges that Dr. Gedney told him that the deterioration of his lower lumbar spine had progressively worsened, but Plaintiff claims she refused to refer him to a pain management specialist or a back specialist for treatment. Dr. Gedney also informed Plaintiff that his medications for leg cramps and sleep were not helping. Dr. Gedney told him he was scheduled for a second MRI, but there was a wait list. He had the second MRI on June 16, 2016, but was not advised of the results. In September and October of 2016, he was scheduled to see Dr. Martin Naughton of NNCC, who advised Plaintiff he was scheduled to receive epidural injections for his back pain, but he did not receive them.

Plaintiff alleges that Dr. Gedney denied him adequate treatment for his back, and Dr. Aranas was advised of his requests for his MRI results and treatment through grievances, but denied them.

Defendants move for summary judgment, arguing that they were not deliberately indifferent to Plaintiff's serious medical needs, and alternatively, that they are entitled to qualified immunity. In his counter-motion, Plaintiff argues that Defendants were deliberately indifferent in denying and delaying treatment for his back.

## II. LEGAL STANDARD

The legal standard governing this motion is well settled: a party is entitled to summary judgment when "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome

of the case. *Id*. at 248 (disputes over facts that might affect the outcome will preclude summary judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250.

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex*, 477 U.S. at 323-24 (purpose of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson*, 477 U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that one party must prevail as a matter of law"). In considering a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach & Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and determine the truth or to make credibility determinations. *Celotex*, 477 U.S. at 249, 255; *Anderson*, 477 U.S. at 249.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations

omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party cannot establish an element essential to that party's case on which that party will have the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475 U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

### III. DISCUSSION

**A. FACTS**

Plaintiff injured his lower back in 2000 or 2001; was evaluated by medical providers outside of prison; an MRI was performed in 2003; he was placed on full disability in 2005 for his back injury; and, was incarcerated in 2006.

On January 6, 2014, a referral was made for an epidural injection from Dr. John Van Horn. (ECF No. 52-1.) At that time, Plaintiff was being prescribed Flexeril, Prednisone and

Neurontin. (ECF No. 52-2 at 9.) On January 21, 2014, it was determined that Plaintiff should be transferred to NNCC to see Dr. Long for a second opinion. (ECF No. 52-1 at 22; ECF No. 52-2 at 8.)

Plaintiff saw Dr. Long on February 19, 2014. Plaintiff reported an industrial injury in 2000 resulting in low back pain, which resulted in his placement on full disability in 2005. His back remained stable, with aches, numbness and tingling down both lower extremities for a number of years, but in 2013, he began to have increasing pain that would interfere with his sleep. He could only walk about two blocks before he had increasing numbness and tingling. On examination, he was described as moving well, and he had no overt tenderness in the low back. He was assessed with progressive low back pain, with bilateral lower limb pain, numbness and tingling since his injury in 2001. Dr. Long thought this was most likely spinal stenosis. His neurologic examination was unremarkable except for decreased sensation in the anterior thighs and limited motion. He had satisfactory strength, but no endurance secondary to the spinal stenosis. He was "starting to become very miserable." (ECF No. 52-1 at 20.) He was taking Flexeril and Neurontin. Dr. Long recommended an MRI, as he suspected significant spinal stenosis, and asked to see Plaintiff back after the MRI. (ECF No. 52-1 at 21.)

Dr. Johns referred Plaintiff for an MRI of the lumbar spine on March 5, 2014, which was authorized on March 11, 2014, and an appointment was made and then rescheduled for April 8, 2014. (ECF No. 52-1 at 18.) Plaintiff was seen on March 26, 2014, and it was noted that the MRI had been rescheduled for an open scanner, and he was to be given Ativan. Other notes suggest this was due to claustrophobia. (ECF No. 52-2 at 8.) The MRI was performed on April 8, 2014. It revealed multilevel degenerative spondylosis; no significant spinal canal stenosis; narrowing of the bilateral lateral recesses at L3-4 and the right lateral recess at L4-5

without frank nerve root entrapment; the exiting right L4 nerve root is contacted by marginal disc material without impingement. (ECF No. 52-4 at 7-8.)

Plaintiff was seen on May 29, 2014, with complaints of chronic back pain. It was noted the MRI had been done. (ECF No. 52-3 at 8.) A referral to see Dr. Long was submitted by Dr. Johns on May 29, 2014. (ECF No. 52-1 at 17.) On July 1, 2014, there is a notation that Plaintiff's Neurontin was to be changed to 600 mg, and the Flexeril to 10 mg. (ECF No. 52-2 at 8.) On July 29, 2014, Dr. Johns noted that the right form was submitted for the second mattress; Plaintiff was to be scheduled with Dr. Long for a follow up, noting the MRI had been done; labs were ordered; and, he was to change the Neurontin to 400 mg. (ECF No. 52-2 at 8.)

A referral to see Dr. Long was submitted on September 2, 2015. (ECF No. 52-1 at 16.)

Dr. Long saw Plaintiff on September 23, 2015, for an evaluation for his back. He reported that he had been involved in an industrial explosion in 2001, and suffered significant soft tissue injuries to the lower back. He reported he was treated with physical therapy, medications and epidural injections every three months for about five years. He indicated that after being incarcerated, he suffered from constant right low back pain, with some pain on the left. It caused difficulty sleeping, and with walking. He also had occasional shooting pain in his feet. He used a cane. He also had numbness in the toes and feet. Since he had been in prison, he had been taking Neurontin, a water pill, and potassium. He had taken Flexeril, but it was stopped; although he did think it helped. (ECF No. 52-1 at 10.) On examination, his gait was described as reasonable, but he was using a cane because he was afraid of sharp shooting pain into his right side. He had marked limited motion in the hip flexors. Dr. Long reviewed the MRI from April 8, 2014, noting multi-level lumbar degenerative disc disease with no significant stenosis, but narrowing of the bilateral recesses at L3-4, and right lateral recesses at L4-5 without

frank nerve root impingement. His symptoms were gradually increasing. Dr. Long concluded he also had peripheral neuropathy, and significant decreased range of motion. Dr. Long concluded that the request for a double mattress was reasonable. Neurontin was helping some, and Plaintiff wanted to continue Flexeril and potassium. Dr. Long indicated that his examination and review of the MRI did not present a definite surgical problem. He noted that Plaintiff stated the epidural injections were not doing much good, and Dr. Long agreed because "after a certain length of time they don't do much." He was to continue using his cane, and Dr. Long would see him on an as-needed basis. He stated that it needed to be discussed whether to increase the Neurontin dosage. (ECF No. 52-1 at 15.)

Plaintiff was seen on December 17, 2015, it appears by Dr. Johns. He reported an industrial accident in 2000, with a back injury. Dr. Johns described his last MRI in April 2014 as "non-surgical." He was assessed with chronic lumbar pain, with increasing symptoms. Another MRI was recommended. (ECF No. 52-2 at 6.) Plaintiff was ordered to have a walker, an extra mattress, a back brace and a consult for an MRI. (ECF No. 52-3 at 6.)

There was a referral for an MRI of the lumbar spine on December 17, 2015, which was authorized on December 22, 2015, and scheduled for an appointment on June 16, 2016. (ECF No. 52-1 at 12.)

On February 10, 2016, Plaintiff submitted an informal level grievance stating that he had an MRI in 2014, but complained that no doctor ever informed him of the results or of a treatment plan. (ECF No. 4 at 16-17.) He asked for the results from a qualified back pain specialist. (*Id*. at 17.) C. Lucas responded that Plaintiff had been seen by providers on more than one occasion, as well as a specialist, and he could have inquired about the results at any time. He was advised that if he wished to discuss the results he should kite to be scheduled with one of the providers.

1 (ECF No. 4 at 15.)

2      Plaintiff was seen on February 18, 2016, by Dr. Gedney, with complaints of back pain

3 from an industrial accident in 2000. He reported he had been getting epidurals and pain

4 medications prior to incarceration. He had shooting pain and numbness in the lateral thigh and

5 toes to mid-foot. He had weakness in the right leg for three to four years. He did not have

6 significant muscle weakness in the legs or feet. He had decreased sensation in the right anterior

7 foot, including the toes, and the left foot had minor decreased sensation in the toes. He was to

8 change muscle relaxers to one that helped more and add Elavil to decrease nerve pain. It was

9 noted that an MRI was pending. (ECF No. 52-2 at 5.)

10      Plaintiff submitted his first level grievance on March 28, 2016, stating that on February

11 18, 2016, Dr. Gedney informed Plaintiff that the MRI showed that the deterioration of his lower

12 back was worse. (ECF No. 4 at 20.) He also disputed Dr. Long's statement in his report that the

13 epidurals no longer worked for him, stating that the epidurals helped him. He again asked for a

14 full treatment plan explained to him by a qualified back pain specialist. (*Id*. at 21-22.)

15 T. Wickham responded that his medical record was reviewed, and he was responded to

16 appropriately at the first level based on his original complaint at the informal level. Since his

17 complaint at the first level changed, he indicated that diagnostic tests had been ordered and

18 Plaintiff was seen by an orthopedic specialist. At that time, a treatment plan was discussed with

19 Plaintiff as he asked whether his medication could be increased. (*Id*. at 19.)

20      On April 18, 2016, it appears Plaintiff was seen, and while the notes are difficult to read

21 they seem to state Plaintiff stated he was doing okay, and was still pending MRI. (ECF No. 52-2

22 at 4.)

23

On April 29, 2016, Plaintiff submitted a second level grievance. He said that the informal response told him to kite to go over his MRI from June of 2014, with the results and treatment plan explained by a qualified back pain specialist. He reiterated that at his February 18, 2016 appointment with Dr. Gedney, she informed Plaintiff that the MRI from June of 2014 showed deterioration of his lower back. Then Dr. Gedney changed Plaintiff's medications. Plaintiff then indicated he saw Dr. Long in the summer of 2015, and claimed Dr. Long made false statements in his medical records. He indicated that Dr. Johns ordered an MRI in December of 2015, and he saw Dr. Gedney on February 18, 2016, not an orthopedic specialist. He stated further that a treatment plan had not been explained to him. He stated that he had been given "low dose" oral medications, as well as a cane, back brace, and walker, but that Dr. Johns refused him ibuprofens or any other pain relieving medication. He did acknowledge receiving Elavil, Flexeril, and Neurontin, which he said were insufficient for the cramps and pain. He asked for the MRI to be performed; surgical intervention; proper pain medication; and physical therapy after the procedures. (ECF No. 4 at 25-31.)

An MRI was conducted on June 16, 2016. (ECF No. 52-1 at 6; ECF No. 52-4 at 4-5.) It revealed: right lateral recess and foraminal disc protrusion combined with marked fact arthropathy with mild lateral recess and moderate foraminal stenosis on the right at L4-5, with potential for impingement of the foraminal segment of L4; central disc bulging with foraminal disc protrusions and mild foraminal narrowing bilaterally at L3-4; right paramedian to lateral recess disc protrusion at L2-3 with mild lateral recess narrowing and inferior foraminal stenosis, with similar foraminal stenosis on the left; a slight 1 to 2 mm grade 1 spondylolisthesis at L4-5 on a degenerative basis. (*Id.*)

The second level grievance response has a transaction date of June 22, 2016, and indicates it was assigned to J. Keast, although there is a stamp on the document with Dr. Aranas' signature and a date of July 5, 2016. The response stated that the grievance was resolved. Plaintiff was scheduled for an MRI on June 16, 2016, and was last seen by a physician on April 18, 2016. He was advised that once his MRI results were interpreted by a radiologist and sent back to NNCC, a physician would review them. In addition, he was referred to the orthopedic clinic at NNCC and would be scheduled to the next available opening. (ECF No. 4 at 24.)

Plaintiff was referred to Dr. Long on July 5, 2016, for a follow up after his MRI of the lumbar spine. (ECF No. 52-1 at 11.)

Plaintiff saw Dr. Long on July 13, 2016. Since his last visit in 2015, his symptoms had increased. He felt continuous low back pain, which was seldom relieved, as well as intermittent shooting pain down the lower limbs, which occasionally caused him to fall. He used a cane while walking indoors, and a walker outdoors. He had difficulty sleeping. He also had numbness and weakness with walking. On examination, his gait, motion and sensation were about the same, but had difficulty stepping onto a six-inch stool. His hip motion had decreased, and his internal and external rotation were somewhat decreased and caused pain. Dr. Long examined the report of the 2016 MRI, noting some progression of instability at L3-4, and that he was developing more lateral recess and foraminal stenosis, particularly at L4-5, but it was described as moderate. He also had degenerative changes at L3-4, with disc bulges, that looked as though they had progressed. His working diagnoses were: progressive lumbar multi-level degenerative disc disease, with progressing foraminal and recess stenosis, particularly at L4-5, with instability. He was taking Flexeril and Elavil. Dr. Long noted that Plaintiff had gradual progression which limiting his ability to walk any distance or stand for any length of time. Dr. Long stated that his

function remained overall satisfactory, with some deterioration, but his pain problem was gradually growing. Dr. Long recommended that he continue use of Flexeril and Elavil, and he could use prescription ibuprofen. He was to continue using the two-level mattresses. Finally, Dr. Long indicated that surgery would be primarily for his complaints of pain (and not function), and an epidural could be tried again. (ECF No. 52-1 at 3-4.)

There was a request for a referral for a consult for an epidural on September 2, 2016, and on September 13, 2016, the referral for an epidural was approved. (ECF No. 52-1 at 6, 7.)

Progress notes from March 9, 2017, indicate that Plaintiff reported an increase in cramping of bilateral extremities and feet, and asked if he was still getting Flexeril and was told he was not as the prescription had expired nine months prior. Dr. Long's notes indicated it was a reasonable treatment, so it was renewed and he was to follow up with the provider. (ECF No. 52-2 at 3.) The Flexeril was renewed that date. (ECF No. 52-3 at 3.)

He had an appointment on May 3, 2017 (ECF No. 52-2 at 3), and on that date there is a referral for surgery consultation and an epidural for chronic low back pain was requested by Dr. Naughton. (ECF No. 52-1 at 5.) Flexeril was renewed, and 800 mg ibuprofen was prescribed. (ECF No. 52-3 at 3.)

Plaintiff saw Dr. Long on August 9, 2017. Since his last visit, he had one epidural (in January of 2017), which helped his symptoms for about three months. At the time of his visit, he felt his ability to walk had decreased. He had a constant dull and aching pain in his low back, which always radiates down into the right and left toes. With certain motions he would experience sharp electrical pains in the same area. He also had numbness spreading down both lower extremities, from the thighs into the feet. It was noted that he had taken Neurontin, which was helping, but it was stopped. Flexeril helped with the cramping. Elavil seemed to help some.

He was also taking some Baclofen. He was using a walker, and did not like to walk without support because of pain. He could not heel and toe walk because of pain, and his motion seemed limited. His sensation was decreased in the lateral thigh and calf and foot in both lower extremities. His working diagnoses were: degenerative disc disease with progressive lateral stenosis, greatest at L3, L4 and L5. He was neurologically intact, but his pain was progressing as the degenerative changes increased. Dr. Long stated that a repeat epidural could be considered, as well as surgical evaluation. (ECF No. 52-1 at 2.)

There is a notation on August 15, 2017, to refer Plaintiff to Dr. Dante Vacca at Sierra Neurosurgery. (ECF No. 52-3 at 3.)

On October 13, 2017, it was ordered that an MRI of the lumbar spine be scheduled, as well as a consultation and evaluation by Dr. Vacca at Sierra Neurosurgery. (ECF No. 52-3 at 2; ECF No. 52-3 at 10.)

An MRI from March 19, 2018, showed grade 1 spondylolisthesis at L4-5 and multilevel spondylosis to include degenerative disc space narrowing, endplate bone spurring and Schmorl's nodes, which had increased particularly from T11-12 to L3-4. There were mild degenerative marrow signal changes within the subchondral bone. He had mildly progressive spondylosis within the upper lumbar levels, and mild acquired spinal stenosis at L2-3 by broad-based disc protrusion, enlarged ligaments and bony facets, as well as worsening lateral recess and foraminal narrowing. (ECF No. 52-1 at 31-32.) Another radiology report from March 22, 2018, revealed moderate diffuse spondylosis and grade 1 L4-5 spondylolisthesis, as well as atherosclerotic plaquing with a nondilated abdominal aorta. (ECF No. 52-1 at 30.)

Plaintiff was evaluated by Dr. Vacca on March 28, 2018. Plaintiff reported he had injections in the past, which helped temporarily. He reported chronic numbness in his feet.

Dr. Vacca's report indicated that the MRI showed stenosis at L3-4 and L4-5, with a grade 1 slip at L4-5. He was using a walker. Plaintiff was assessed with lumbar stenosis with spondylolisthesis at L4-5. Dr. Vacca told Plaintiff surgery was an option, but he did not see anything that would absolutely require an operation, but it could help reduce his pain, but not make him pain free. He would undergo L3 to L5 decompression with fusion at L4-5. Plaintiff indicated he wanted to proceed. (ECF No. 52-1 at 34-35.)

A second opinion was sought from Dr. Aury N. Nagy of Nevada Brain and Spine Care. (ECF No. 52-1 at 29, 40.)

Plaintiff saw Dr. Nagy on July 30, 2018. (ECF No. 52-1 at 24, 27-28.) On examination, Plaintiff had limited range of motion in the lumbar spine and pain on rising from a seated position without frank weakness. Dr. Nagy did not have the actual imaging studies from the MRI, but the reports did show obvious pathology at L4-5 with grade 1 anterolisthesis, and a darkened disk at L5-S1. Dr. Nagy opined that Plaintiff might benefit from fusion at L4-5 and L5-S1 in addition to the L3 laminectomy. Dr. Nagy requested the images to make a determination of whether or not to add an additional level to the surgery. (ECF No. 52-1 at 27-28.)

A consult for an epidural was requested on September 2, 2018. (ECF No. 52-3 at 4.)

There is a notation from Dr. Nagy on October 16, 2018, stating that since Plaintiff's last visit Dr. Nagy was able to review the MRI, and concluded that Dr. Vacca made the correct decision in choosing to recommend laminectomy at L2, L3, L4 and fusion at L4-5. (ECF No. 52-1 at 25.) Dr. Nagy would offer the same procedures as it would give Plaintiff the best opportunity to alleviate his current symptoms. (*Id*. at 26.)

In February of 2019, Plaintiff underwent lumbar decompression surgery with Dr. Vacca.

14

**B. Eighth Amendment Deliberate Indifference Standard**

A prisoner can establish an Eighth Amendment violation arising from deficient medical care if he can prove that prison officials were deliberately indifferent to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A claim for deliberate indifference involves the examination of two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *rev'd on other grounds, WMX Tech, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997); *see also Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104); *see also Akhtar*, 698 F.3d at 1213. Examples of conditions that are "serious" in nature include "an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin*, 974 F.2d at 1059-60; *see also Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (citation omitted) (finding that inmate whose jaw was broken and mouth was wired shut for several months demonstrated a serious medical need).

Defendants do not contest that Plaintiff suffered from a serious medical need; therefore, the court's focus is on the subjective criteria: deliberate indifference. If the medical need is "serious," the plaintiff must show that the defendant acted with deliberate indifference to that need. *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213 (citation omitted). "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Deliberate indifference entails something more than medical malpractice or even gross

negligence. *Id*. Inadvertence, by itself, is insufficient to establish a cause of action under section 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (citation omitted).

Deliberate indifference exists when a prison official "den[ies], delay[s] or intentionally interfere[s] with medical treatment, or it may be shown by the way in which prison officials provide medical care." *Crowley v. Bannister*, 734 F.3d 967, 978 (9th Cir. 2013) (internal quotation marks and citation omitted). "'[A] prisoner need not prove that he was completely denied medical care' in order to prevail" on a claim of deliberate indifference. *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012) (quoting *Lopez*, 203 F.3d at 1132), *overruled on other grounds*, *Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014). Where delay in receiving medical treatment is alleged, a prisoner must demonstrate that the delay led to further injury. *McGuckin*, 974 F.2d at 1060.

"A difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Snow*, 681 F.3d at 987 (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). Instead, to establish deliberate indifference in the context of a difference of opinion between a physician and the prisoner or between medical providers, the prisoner "'must show that the course of treatment the doctors chose was medically unacceptable under the circumstances' and that the defendants 'chose this course in conscious disregard of an excessive risk to plaintiff's

1  health.'" *Snow*, 681 F.3d at 988 (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996));

2  *see also Edmo v. Corizon*, 935 F.3d 757, 786 (9th Cir. Aug. 2019) (citations omitted).

3  **C. Analysis**

4  Defendants argue they were not deliberately indifferent to Plaintiff's back issues. They

5  contend that Plaintiff received a comprehensive course of treatment for his back condition,

6  including surgery. They assert there is no evidence that the course of treatment Dr. Gedney and

7  Dr. Aranas provided was medically unacceptable under the circumstances or in conscious

8  disregard of an excessive risk to Plaintiff's health. They point out that Plaintiff was seen annually

9  by Dr. Long; had his medications adjusted regularly; received diagnostic MRIs; was seen by

10  Dr. Vacca; was given a second opinion by Dr. Nagy; and, ultimately had surgery in an effort to

11  reduce his pain.

12  Plaintiff argues that Defendants knew his back injury was causing him degenerative

13  harm, and they purposefully delayed adequate medical treatment. He contends that Dr. Gedney

14  did so between March of 2014 until she retired in March of 2016. Plaintiff contends that

15  Dr. Gedney knowingly disregarded Plaintiff's repeated requests for adequate medical care and

16  corrective back surgery and to be seen and evaluated by an independent orthopedic pain

17  management specialist even though his 2014 MRI and Dr. Long's September 23, 2015 report

18  revealed the degenerative changes to his spine.  He further asserts that Dr. Gedney purposefully

19  delayed the surgical treatment Plaintiff required. Then, he claims that Dr. Johns became acting

20  senior physician at NNCC, and she continued to purposefully delay Plaintiff's medical care and

21  therapy until she retired in September of 2018. At that point, he contends that Dr. Naughton

22  became the senior physician at NNCC, and he continued the deliberate indifference, before and

23  after Plaintiff's February 2019 back surgery. He states that Dr. Naughton scheduled him for

epidural injections, but he never received them. Finally, Plaintiff argues that Dr. Aranas knew of and disregarded Plaintiff's repeated requests for medical care and therapy that Plaintiff had requested, including for corrective back surgery and examination by an independent orthopedic specialist therapy by denying his grievances.

In his counter-motion, Plaintiff states he has demonstrated that Defendants acted with deliberate indifference in purposefully delaying adequate medical treatment and failing to provide him with professional medical therapy and treatment.

First, Plaintiff discusses conduct and liability of Dr. Johns and Dr. Naughton, but they are not defendants in this action. As was discussed, *supra*, Plaintiff sought leave to amend to add them as defendants, but the court denied this motion because it was filed well after the expiration of the scheduling order deadline to add parties/amend. Moreover, Plaintiff did not demonstrate good cause to do justify amendment beyond the scheduling order deadline as Plaintiff knew of Dr. Johns' and Dr. Naughton's alleged involvement long before the motion was filed. (ECF No. 66.) Therefore, the court will disregard Plaintiff's arguments as to those doctors.

Second, Plaintiff provides no evidence to create a genuine dispute of material fact as to whether Defendants Drs. Gedney and Aranas were deliberately indifferent to Plaintiff's back condition.

The only evidence in the record relative to Dr. Gedney is as follows: Plaintiff was transferred to NNCC to see Dr. Long in January of 2014, and saw him on February 19, 2014. An MRI was recommended, and Plaintiff was to follow up with Dr. Long after they had the results. Dr. Johns referred Plaintiff for the MRI shortly thereafter, on March 5, 2014. The MRI was rescheduled to accommodate claustrophobia issues, and took place on April 8, 2014. Plaintiff was seen the following month, and there was a referral for him to see Dr. Long again. Two

months later, Dr. Johns noted that Plaintiff had been scheduled for Dr. Long for a follow up, labs had been ordered, and his medications were adjusted. There is another notation of a referral to have Plaintiff see Dr. Long dated September 2, 2015. Plaintiff saw Dr. Long on September 23, 2015. There is no indication in the record as to the reason for the delay in the follow up with Dr. Long; however, there is no evidence attributing the delay to Dr. Gedney. In fact, there is no evidence that Plaintiff had even seen Dr. Gedney up to that point. Plaintiff makes brief mention of kites to Dr. Gedney, but does not actually submit any kites he sent as evidence in order to show Dr. Gedney knew of any delay and failed to address Plaintiff's concerns. Nor does Plaintiff present any evidence that Plaintiff ever notified Dr. Gedney that he had not received the results of the 2014 MRI.

Then, when Plaintiff saw Dr. Long in September of 2015, Dr. Long's report indicates that he reviewed the April 2014 MRI. Dr. Long stated that the MRI did not present a definite surgical problem. Dr. Long noted that the epidurals were not doing much good. Plaintiff disputes this was the case, but there is no evidence he presented this concern to Dr. Gedney. Dr. Long told him to continue to use his cane, and take his medications and he would return on an as-needed basis.

Plaintiff saw Dr. Johns less than two months later, and at that point another MRI was recommended. Dr. Johns also ordered a walker, an extra mattress, a back brace and a consult for the MRI. She made a referral for the MRI for the same date, and it was noted that the consult for the MRI was authorized and an appointment was made for June 16, 2016. It is not clear why there was such a delay for the MRI, but there is no evidence that Dr. Gedney (or Dr. Aranas) had any involvement in the scheduling of the MRI.

Plaintiff submitted his informal level grievance on February 10, 2016, stating that he had not had his 2014 MRI results explained to him, or a treatment plan. While Plaintiff claims that he

had not had his MRI results explained to him, it appears that Dr. Long did go over them, or at the very least, Plaintiff could have inquired when he saw Dr. Long, or subsequently, when he saw Dr. Johns. Shortly thereafter, Plaintiff saw Dr. Gedney on February 18, 2016. Dr. Gedney examined Plaintiff, and adjusted his medications to some that would help more with the pain, and noted that he was pending for an updated MRI. According to Plaintiff, Dr. Gedney retired the following month, in March of 2016. Plaintiff was seen next by an NNCC provider in April 2016, and the updated MRI was performed in June of 2016. He saw Dr. Long again in July of 2016.

There is no evidence that Dr. Gedney was deliberately indifferent to a serious medical need. Even taking as true that Dr. Gedney told Plaintiff that his MRI showed his condition had deteriorated, Dr. Gedney examined him, and adjusted his medications to get him some more relief, and noted that they were awaiting a pending updated MRI. Since Dr. Long had indicated that the last MRI did not present a definite surgical problem, it cannot be said that Dr. Gedney's chosen course to adjust his medications and await the updated MRI was medically unacceptable under the circumstances or in conscious disregard of an excessive risk to Plaintiff's health.

Insofar as Dr. Aranas is concerned, the only evidence of his involvement is possibly as a responder to Plaintiff's second level grievance at the end of June/beginning of July 2016. The response to that grievance indicated that Plaintiff had been scheduled for the requested MRI on June 16, 2016, and prior to that had been seen by a physician, and that once the MRI results were in, a physician would review them and he would be referred to the orthopedic clinic at the next available opening. Plaintiff was in fact referred to see Dr. Long on July 5, 2016, for a follow up after his updated MRI, and saw him on July 13, 2016. Plaintiff has not presented nor pointed to

1    any other evidence in the record that would indicate that Dr. Aranas otherwise knew of and

2    disregarded a risk to Plaintiff's health.

3           Plaintiff takes issue with Defendants' reliance on a declaration by Dr. Naughton that was

4    submitted under seal in connection with Defendants' opposition to Plaintiff's motion that the

5    court order he be seen by a specialist. The court has not relied on Dr. Naughton's declaration in

6    coming to its conclusion on the instant motions. Instead, the court has relied on the medical

7    records that have been presented to the court, which constitute the relevant facts for purposes of

8    this action. Therefore, Plaintiff's argument that the court should deny Defendants' motion on this

9    basis should be rejected.

10          Plaintiff did not file a response to Defendants' motion for leave to file his medical records

11   under seal, but asserts in his briefing in connection with the dispositive motions that he does

12   object to this. Under NDOC procedures, the medical records are filed under seal to keep

13   sensitive health information out of the public's view. Plaintiff *is*, however, permitted to kite to

14   review the records filed under seal, and it appears he did so as he describes the records in his

15   briefing. Insofar, as Plaintiff asks the court to deny Defendants' motion on this basis, the

16   argument should likewise be rejected.

17          In sum, Defendants have met their burden of demonstrating they were not deliberately

18   indifferent to Plaintiff's back condition. Plaintiff has not pointed to evidence that would raise a

19   genuine dispute of material fact so as to defeat their motion. Nor has Plaintiff submitted evidence

20   in support of his own motion to demonstrate that there is no genuine dispute that Defendants

21   were deliberately indifferent to his back condition. Therefore, Defendants' motion for summary

22   judgment should be granted, and Plaintiff's counter-motion should be denied. In light of this

23   conclusion, the court need not reach Defendants' qualified immunity arguments.

## IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order **GRANTING** Defendants' Motion for Summary Judgment (ECF No. 50), and **DENYING** Plaintiff's Counter-Motion for Summary Judgment (ECF No. 61).

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: October 8, 2019

_____
William G. Cobb
United States Magistrate Judge